**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **GARY IRVING REYNOLDS**<br>2403 Olson Street<br>Temple Hills, MD 20748<br><br>     Plaintiff,<br><br> v.<br><br><br>**ALBERTO GONZALES**<br>U.S. Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>     Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

1. Gary Irving Reynolds (hereafter "Plaintiff Reynolds or Dr. Reynolds"), brings

this action for injunctive relief and damages based on the denial of his rights

under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*,

as amended by the Civil Rights Act of 1991 (hereafter "Title VII").  The

Department of Justice (hereafter "DOJ"), Federal Bureau of Prisons (hereafter

"the Agency" or "BOP") discriminated against Plaintiff Reynolds because of

his race in violation of Title VII and retaliated against him for engaging in

protected activities under the statue.

## JURISDISCTION AND VENUE

2.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a)(3), and 1343(a)(4), and 42 U.S.C. § 2000e-5.

3.    Pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in the District of Columbia which is the location where Defendant has its principal office and where, upon information and belief, management decisions concerning the adverse personnel actions alleged herein took place and where the employment records relevant to the Complaint are located.

## PARTIES

4.    Dr. Gary Irving Reynolds is an African-American male, employed with BOP, who engaged in prior protected activity under Title VII when he filed an EEO complaint with the DOJ in February 2005.  He is also a member of the Air Force Reserve.

5.    Alberto Gonzales is the Attorney General of the United States, Department of Justice.  The Attorney  General is being sued in his official capacity as provided by law based on his executive responsibility for administering DOJ personnel policies and his responsibility to enforce and to promote equal employment opportunity throughout the DOJ.  During the relevant time period, the DOJ has employed over 500 employees.

## FACTS

## RACE DISCRMINATION

6.      Plaintiff re-alleges paragraphs 1-5 and incorporates them fully herein.

7.      On or about October 25, 1998, Dr. Reynolds began working for the Bureau of
Prisons.  Dr. Reynolds is currently assigned to a Federal Detention Center and
serves in the capacity as a Medical Officer, GS-15, Step 10.

8.      From the time of Dr. Reynolds arrival at the Federal Detention Center to the
time of his EEO complaint, Dr. Reynolds examined well over 1,000 prisoners,
all within the community standard of medical care and professional conduct.

9.      On or about July 11, 2002, a female inmate alleged that Dr. Reynolds acted
inappropriately during a medical examination.  Mr. Joseph Smith, Warden of
the Federal Detention Center, contacted the Office of Internal Affairs
(hereafter "OIA") who in turn assigned Gloria Tereshinski, Monitoring Agent
for the FDC in Pennsylvania, to investigate.   Shortly thereafter, Ms.
Tereshinski found that the inmate's claims were unsubstantiated and
dismissed the case.  Warden Smith never notified Dr. Reynolds about the
investigation results.

10.     In or about May 2004, an inmate alleged that Dr. Reynolds had acted
inappropriately with her during a routine exam.  Once again the OIA was
contacted and the claims were found to be false.

11.     In or about September 2004 and November 2004, two female inmates made
allegations that Dr. Reynolds acted inappropriately during their examinations.
These two complaints were combined and investigated by the Office of the

Inspector General for the Department of Justice.  In both instances the cases were found to be without merit.    The Warden and Chief Executive Officer at the time was Edward Motley.

12.    Although all of the allegations against Dr. Reynolds were unsubstantiated, BOP management refused to support Dr. Reynolds, the only African-American physician at the Federal Detention Center.  In particular, Warden Motley, Associate Warden Kenneth Arnold, Northeast Regional Director F. Scott Dodrill and Medical Director Dr. Newton Kendig (based in the BOP Central Office), used false and unproven complaints by inmates, who were known to have motive to lie, as a pretext to make Dr. Reynolds an unattractive candidate for selection to other positions by deliberately harming his professional reputation and integrity.

13.    On or about October 15, 2004, Associate Warden Kenneth Arnold gave Dr. Reynolds a written memorandum directing Dr. Reynolds to use female chaperones whenever he examined female inmates.  This memorandum was issued without any reference to an active investigation against or involving Dr. Reynolds.  The memorandum deviated from community standards which dictate that chaperones are only used when the patient requests one or when an examination of an intimate anatomical area (such as breasts or genitals) is required.  Because Dr. Reynolds had not been notified of any investigation, this memorandum was a discriminatory deviation from community standards as it instructed only Dr. Reynolds, and not other physicians, to use female chaperones.  This also deviated from BOP policy in that a restriction of this

type is imposed by the Clinical Director at the institution, Dr. David Massa, who was the privilege granting authority for physicians at the institution, and not by an Associate Warden. Dr. Reynolds suspected that this memorandum was intended to be a permanent restriction.

14.    Warden Motley, Mr. Arnold, Regional Director Dodrill and Dr. Kendig decided to place restrictions on Dr. Reynolds which were not placed on any other similarly situated Caucasian practitioners who were subject to investigations that were found to be without merit. Singling Dr. Reynolds out for this restriction was inequitable because, if there was a sincere concern about the risk of future allegations, BOP should have instituted a policy for chaperones when any practitioner examined an inmate of the opposite gender.

15.    On the same day he was issued the restrictions, Dr. Reynolds submitted a reply to the memorandum issued by BOP. He vehemently objected to the restrictions applied to his practice of medicine and supplied a list of reasons as to why such restrictions were unnecessary and constituted disparate treatment. He also noted that BOP failed to identify the specifics of the allegations made against him.

16.    Despite his protest, Dr. Reynolds remained on the restrictions which caused an undue hardship on his practice of medicine. The restrictions caused unnecessary delays in treating patients and hampered Dr. Reynolds' ability to provide adequate medical treatment to the inmates in his care. By way of example, there is limited BOP female staff available at the Federal Detention Center. Because of this, the restriction interfered with Dr. Reynolds ability

to respond to medical emergencies involving female inmates, as often there was no female BOP staff available to serve as a chaperone.

17.    In or about September 2004, Dr Reynolds applied for a position in Central Office (04-CO-119).  In his reference, Warden Motley falsely indicated Dr. Reynolds had pleaded guilty to one OIA investigation and had two OIA investigations pending.  As a result of this negative reference, Dr. Reynolds was not selected for the position.

18.    On or about January 31, 2005, Dr. Reynolds requested that Mr. Arnold remove the practice restrictions.  Dr. Reynolds made this request because determinations on similar investigations are usually made within ninety (90) days.  Despite knowing that all the allegations were found to be without merit, Associate Warden Arnold would not lift the practice restrictions.

19.    BOP's failure to lift the restrictions caused harm to Dr. Reynolds' professional reputation.  In particular, Dr. Reynolds also serves as a physician when he called to duty for the Air Force Reserve.  Because Dr. Reynolds' re-credentialing for the military was due during this time period, Dr. Reynolds was required to report that the investigation against him was still pending.  As a result, Dr. Reynolds' physician privileges with the Air Force Reserve were also restricted.

20.    Additionally, charges of inappropriate sexual conduct with a patient are serious charges which can result in automatic sanctions and censure by state medical licensure boards.  Furthermore, such allegations could potentially be reported to the National Practitioner Data Bank.

21.     On or about February 7, 2005, Dr. Reynolds, desperate to salvage his professional reputation, sent an electronic message to Warden Motley requesting that the restriction be removed. Warden Motley did not respond to Dr. Reynolds' request.

22.     On or about February 14, 2005, Dr. Reynolds called the EEO office to file a complaint regarding the Agency's discriminatory behavior.

23.     On or about March 8, 2005, Associate Warden Tracey V. Brown officially removed the practice restrictions against Dr. Reynolds. However, BOP should have notified Dr. Reynolds in a timely fashion that the accusations were unfounded and that the restrictions would be removed, rather than lifting the restrictions only in response to an EEO complaint.

24.     On or about March 16, 2005, Dr. Reynolds filed a formal EEO discrimination complaint.

25.     In or about May 2005, the formal investigation of Dr. Reynolds' EEO allegations commenced. On or about August 1, 2005, the investigator submitted the EEO Report of Investigation to the EEO office.


## REPRISAL[1]

26.     On or about December 11, 2005, Dr. Reynolds submitted his written preferences for annual leave in calendar year 2006 to the Health Services Administrator, Aramis Martinez. Dr. Reynolds indicated his first preference was the seven day period June 25 to July 1, 2006 and his second preference was the seven day period July 2 to July 9, 2006.

---

[1] Dr. Reynolds retaliation claims are based solely, and limited to, Agency EEO No. P-2006-0320.

27. On June 26, 2006, Dr. Reynolds used accrued sick leave for a doctor's appointment. On June 27, 2006, Dr. Reynolds sent an electronic message to Dr. Odeida Dalmasi, Clinical Director of the Federal Detention Center and Associate Warden Tracey Brown requesting a decision regarding the annual leave requested for June 30 and July 3-5, in addition to military leave for July 6-7. On or about June 29, 2006, Dr. Reynolds sent another e-mail reminding Dr. Dalmasi of his leave request. Dr. Reynolds received no response from Dr. Dalmasi. However, Associate Warden Brown replied electronically that the leave requests were approved in December 2005.

28. Accordingly, in June and July 2006, Dr. Reynolds took the leave he requested for vacation and to attend training with the Air Force Reserve. During his scheduled military leave, Dr. Reynolds' was directed by his Air Force Reserve unit to attend the Aerospace Medicine Primary Course at Brooks Air Force Base, TX, beginning July 11, 2006, where he would remain until August 20, 2006. When he received a copy of the orders for the Aerospace Medicine Primary Course on or about July 24, 2006, he sent documentation to his supervisor and timekeeper indicating his need for additional military leave.

29. Despite knowing that Dr. Reynolds could justify the sick leave used on June 26, 2006, and had previously requested leave for vacation and military duty, Dr. Dalmasi nonetheless classified Dr. Reynolds as absent without leave (hereafter "AWOL") for June 26 and June 30, 2006 in retaliation for his EEO complaint.

30.    Subsequently, Associate Warden Tracey Brown also classified Dr. Reynolds as AWOL for the period from July 9 through July 22, 2006. Associate Warden Brown went further to announce during a Department Head meeting held in July or August 2006 that Dr. Reynolds was AWOL. These actions were taken in retaliation for Dr. Reynolds' prior EEO complaint.

31.    On or about August 28, 2006, Dr. Dalmasi again classified Dr. Reynolds as AWOL despite a communication log entry dated August 27, 2006 which indicated that Dr. Reynolds would be absent.

32.    On or about September 7, 2006, Dr. Dalmasi further harassed Dr. Reynolds by questioning his work ethic in front of their supervisor, Associate Warden Brown.

33.    On or about September 7, 2006, Dr. Dalmasi met with Dr. Reynolds to supposedly discuss and clarify management's expectations of Dr. Reynolds in regards to the administration of his patient case load and to ensure compliance with BOP policy.

34.    On or about September 7, 2006, Dr. Dalmasi alleged that Dr. Reynolds had engaged in misconduct or improper performance of official duties. These allegations were unmerited and were made against Dr. Reynolds in retaliation for filing his race discrimination complaint.

35.    On or about September 6, 2006, Dr. Reynolds filed a retaliation complaint with the EEO.

36.    On or about November 1, 2006, in an effort to hamper Dr. Reynolds work productivity, BOP restricted Dr. Reynolds access to the Internet. For

example, on or about November 15, 2006, Dr. Reynolds could not access an Internet website which contained information which would have assisted him with the treatment of patients with Parkinson's disease.

37.    On or about November 29, 2006, in an effort to discredit Dr. Reynolds, BOP informed Dr. Reynolds that it would conducting a focused medical review of several inmates in his care.  This review was unfounded and undertaken in retaliation for Dr. Reynolds' EEO complaints.

38.    On or about December 27, 2006, Dr. Reynolds attended a conference with Warden Troy Levi and Associate Warden Brown.  During the conference, Warden Levi told Dr. Reynolds that he had been in communication with both Northeast Regional Director Dodrill and Medical Director Kendig regarding the focus review.  Warden Levi went on to inform Dr. Reynolds that, although the focused review did not indicate incompetence, it supposedly demonstrated that Dr. Reynolds did not complete tasks or follow up on concerns in a timely fashion.  Based on this, Warden Levi informed Dr. Reynolds that he would halt Dr. Reynolds' Physician Comparability Allowance Payments and require any payments made during the contract period be repaid to the BOP.  Warden Levi then directed Associate Warden Brown to inform him anytime Dr. Reynolds displayed alleged "passive-aggressive" behavior similar to that which purportedly occurred during a visit by the Northeast Region Clinical Consultant, Dr. John Manenti, so that the information could be used to bolster unfounded disciplinary action against Dr. Reynolds in the future.

39.    On or about December 29, 2006, in an effort to further retaliate against Dr. Reynolds and to force Dr. Reynolds to resign, Warden Levi and Associate Warden Brown met with Dr. Reynolds and informed him that there would be ongoing investigations regarding his performance.  The Warden also informed Dr. Reynolds that he would have to operate under a daily plan developed by Dr. Dalmasi, Clinical Director at the Federal Detention Center.  This daily plan was designed to be demeaning and was a deliberate attempt to harm Dr. Reynolds' professional reputation.   The   Warden then  asked  Dr. Reynolds if he wanted to resign.

## STATEMENT OF CLAIMS

**COUNT I:    Race Discrimination in Violation of Title VII:**

40.    Plaintiff re-alleges paragraphs 1-39 and incorporates them fully herein.

41.    Dr. Reynolds alleges that Defendant, and/or agents or employees acting on its behalf, discriminated against him on the basis of his race (African-American) by denying him employment opportunities and subjecting him to adverse and disparate treatment.

42.    As a result of the discrimination, Dr. Reynolds has been subjected to adverse and disparate treatment.  Dr. Reynolds further alleges that these acts violate Title VII and that he has suffered and will continue to suffer severe emotional and mental distress, loss of salary and benefits and loss of employment opportunities and career advancement.

**COUNT II:       Retaliation in violation of Title VII:**

43.     Plaintiff re-alleges paragraphs 1-42 and incorporates them fully herein.

44.     Dr. Reynolds additionally alleges that Defendant, and/or agents or employees acting on its behalf, retaliated against him for his opposition to Defendant's unlawful employment practices, his participation in protected activity and the EEO/EEOC process.

45.     As a result of the retaliation, Dr. Reynolds has been subjected to adverse and disparate treatment.  Dr. Reynolds further alleges that these acts violate Title VII and that he has suffered and will continue to suffer severe emotional and mental distress, loss of salary and benefits and loss of employment opportunities and career advancement.

## RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully requests this Court to:

A.     Enter judgment for Plaintiff against Defendant on all Counts;

B.     Declare that the conduct of Defendant is in violation of Title VII of the Civil Rights Act of 1964, as amended;

C.     Order the Agency to cease its disparate treatment and retaliation of Plaintiff and to take such affirmative action as is necessary to ensure that the effects of its unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities, including, but not limiting to, awarding Plaintiff damages to compensate him for his loss of salary and other economic losses, such as employment benefits and other

workplace entitlements retroactive to the date of any unlawful action found to have occurred in this case;

D.    Award Plaintiff compensatory damages for the injuries and losses that he suffered in an amount to be proved at trial;

E.    Pecuniary and out of pocket expenses;

F.    Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses incurred by Plaintiff as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest;

G.    Order the Agency to refrain from taking any act of retaliation, including involuntary reassignment or involuntary relocation of Plaintiff because of this suit; and

H.    Order such other equitable and legal relief as the Court deems necessary and appropriate.


## JURY DEMAND

Plaintiff requests a trial by a jury of his peers as to all claims set forth in this Complaint.

Dated March 15, 2007          Respectfully submitted,


_____

Camilla C. McKinney
D.C. Bar No.  448776
Law Offices of Camilla C. McKinney, PLLC
1100 Fifteenth Street, N.W., Suite 300
Washington, D.C.  20005
(202) 861-2934 (telephone)
(202) 517-9111 (facsimile)
*Attorney for Plaintiff Dr. Gary Irving Reynolds*

07-499
H
RCL

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Gary Reynolds<br>2403 Olson Street<br>Temple Hills, MD 20748 | Alberto Gonzales, Attorney General<br>US DOJ, 950 Pennsylvania Ave, NW<br>Washington, DC 20530 |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Camilla C. McKinney, Esquire
Law Offices of Camilla C. McKinney
1100 Fifteenth Street, NW
Suite 300
Washington, DC 20005

Case: 1:07-cv-00499
Assigned To : Lamberth, Royce C.
Assign. Date : 3/15/2007
Description: REYNOLDS v. GONZALES

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government
   Plaintiff

O 3 Federal Question
   (U.S. Government Not a Party)

● 2 U.S. Government
   Defendant

O 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

O **A. Antitrust**

☐ 410 Antitrust

O **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

O **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
   Administrative Agency is Involved)

O **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

O **E. General Civil (Other)**   OR   O **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O **G. Habeas Corpus/ 2255** | **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   O 2 Removed from State Court   O 3 Remanded from Appellate Court   O 4 Reinstated or Reopened   O 5 Transferred from another district (specify)   O 6 Multi district Litigation   O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Denial of rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ [_____]   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐•☐   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☐•☐   If yes, please complete related case form.

DATE  **3-15-07**    SIGNATURE OF ATTORNEY OF RECORD _____

JTC

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.