UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GARY IRVING REYNOLDS ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL MUKASEY, ATTORNEY ) <br> GENERAL, UNITED STATES ) <br> DEPARTMENT OF JUSTICE ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 07-00499 (RCL) |

## NOTICE OF AMENDED COMPLAINT

Plaintiff Gary Irving Reynolds hereby respectfully provides notice of Plaintiff's First Amended Complaint. A Motion to Amend the Complaint is not required because the Defendant has not yet filed a responsive pleading. See FRCP 7(a), which defines a pleading, and FRCP 7(b), which treats motions separately. See also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 216 F.3d 764, 788 (9th Cir. 2000)(a motion to dismiss is not a pleading); Principal Health Care of Louisiana, Inc. V. Lewer Agency, Inc., 38 F.3d 240, 244 (5th Cir. 1994)(a motion for summary judgment is not a pleading).

Accordingly, Plaintiff is filing his First Amended Complaint pursuant to FRCP 15(a) which provides that a "party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served."

Furthermore, because Plaintiff has filed an Amended Complaint, Defendant's Motion to Dismiss or in the Alternative for Summary Judgment should be denied, without prejudice, as moot.

Dated: January 15, 2008                                     Respectfully submitted,


                                                            _____/s_____
                                                            Camilla C. McKinney
                                                            McKinney & Associates, PLLC
                                                            1100 Fifteenth Street, N.W., Suite 300
                                                            Washington, D.C. 20005
                                                            (202) 861-2934 (telephone)
                                                            (202) 517-9111 (facsimile)
                                                            **Attorneys for Plaintiff Dr. Gary Irving Reynolds**


## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of January, 2008, I caused a true and correct copy of the foregoing Notice of First Amended Complaint to be served electronically, via CM/ECF, to:

Andrea McBarnette, Esquire
Assistant United States Attorney
Department of Justice
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7153


                                                            _____/s_____
                                                            Camilla C. McKinney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GARY IRVING REYNOLDS**<br><br>Plaintiff,<br><br>v.<br><br>**MICHAEL MUKASEY, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 07-00499 (RCL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED COMPLAINT**

1. Gary Irving Reynolds (hereafter "Plaintiff Reynolds or Dr. Reynolds"), brings this action for injunctive relief and damages based on the denial of his rights under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (hereafter "Title VII"). The Department of Justice (hereafter "DOJ"), Federal Bureau of Prisons (hereafter "the Agency" or "BOP") discriminated against Plaintiff Reynolds because of his race in violation of Title VII and retaliated against him for engaging in protected activities under the statue.

**JURISDISCTION AND VENUE**

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a)(3), and 1343(a)(4), and 42 U.S.C. § 2000e-5.

3. Pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in the District of Columbia which is the location where Defendant has its principal office and where, upon information and belief, management decisions concerning the adverse

personnel actions alleged herein took place and where the employment records relevant to the Complaint are located.

## PARTIES

4. Dr. Gary Irving Reynolds is an African-American male, employed with BOP, who engaged in prior protected activity under Title VII when he filed an EEO complaint with the DOJ in February 2005. He is also a member of the Air Force Reserve.

5. Michael Mukasey is the Attorney General of the United States, Department of Justice. The Attorney General is being sued in his official capacity as provided by law based on his executive responsibility for administering DOJ personnel policies and his responsibility to enforce and to promote equal employment opportunity throughout the DOJ. During the relevant time period, the DOJ has employed over 500 employees.

## FACTS

6. Plaintiff re-alleges paragraphs 1-5 and incorporates them fully herein.

7. On or about October 25, 1998, Dr. Reynolds began working for the Bureau of Prisons. Dr. Reynolds is currently assigned to a Federal Detention Center and serves in the capacity as a Medical Officer, GS-15, Step 10.

8. From the time of Dr. Reynolds arrival at the Federal Detention Center to the time of his EEO complaint, Dr. Reynolds examined well over 1,000 prisoners, all within the community standard of medical care and professional conduct.

9. On or about July 11, 2002, a female inmate alleged that Dr. Reynolds acted inappropriately during a medical examination. Mr. Joseph Smith, Warden of the Federal Detention Center, contacted the Office of Internal Affairs (hereafter "OIA") who in turn assigned Gloria Tereshinski, Monitoring Agent for the FDC in Pennsylvania, to

investigate. Shortly thereafter, Ms. Tereshinski found that the inmate's claims were unsubstantiated and dismissed the case. Warden Smith never notified Dr. Reynolds about the investigation results.

10. In or about May 2004, an inmate alleged that Dr. Reynolds had acted inappropriately with her during a routine exam. Once again the OIA was contacted and the claims were found to be false.

11. In or about September 2004 and November 2004, two female inmates made allegations that Dr. Reynolds acted inappropriately during their examinations. These two complaints were combined and investigated by the Office of the Inspector General for the Department of Justice. In both instances the cases were found to be without merit. The Warden and Chief Executive Officer at the time was Edward Motley.

12. Although all of the allegations against Dr. Reynolds were unsubstantiated, BOP management refused to support Dr. Reynolds, the only African-American physician at the Federal Detention Center. In particular, Warden Motley, Associate Warden Kenneth Arnold, Northeast Regional Director F. Scott Dodrill and Medical Director Dr. Newton Kendig (based in the BOP Central Office), used false and unproven complaints by inmates, who were known to have motive to lie, as a pretext to make Dr. Reynolds an unattractive candidate for selection to other positions by deliberately harming his professional reputation and integrity.

13. On or about October 15, 2004, Associate Warden Kenneth Arnold gave Dr. Reynolds a written memorandum directing Dr. Reynolds to use female chaperones whenever he examined female inmates. This memorandum was issued without any reference to an active investigation against or involving Dr. Reynolds. The memorandum deviated from

community standards which dictate that chaperones are only used when the patient requests one or when an examination of an intimate anatomical area (such as breasts or genitals) is required. Because Dr. Reynolds had not been notified of any investigation, this memorandum was a discriminatory deviation from community standards as it instructed only Dr. Reynolds, and not other physicians, to use female chaperones. This also deviated from BOP policy in that a restriction of this type is imposed by the Clinical Director at the institution, Dr. David Massa, who was the privilege granting authority for physicians at the institution, and not by an Associate Warden. Dr. Reynolds suspected that this memorandum was intended to be a permanent restriction.

14. Warden Motley, Mr. Arnold, Regional Director Dodrill and Dr. Kendig decided to place restrictions on Dr. Reynolds which were not placed on any other similarly situated Caucasian practitioners who were subject to investigations that were found to be without merit. Singling Dr. Reynolds out for this restriction was inequitable because, if there was a sincere concern about the risk of future allegations, BOP should have instituted a policy for chaperones when any practitioner examined an inmate of the opposite gender.

15. On the same day he was issued the restrictions, Dr. Reynolds submitted a reply to the memorandum issued by BOP. He vehemently objected to the restrictions applied to his practice of medicine and supplied a list of reasons as to why such restrictions were unnecessary and constituted disparate treatment. He also noted that BOP failed to identify the specifics of the allegations made against him.

16. Despite his protest, Dr. Reynolds remained on the restrictions which caused an undue hardship on his practice of medicine. The restrictions caused unnecessary delays in

treating patients and hampered Dr. Reynolds' ability to provide adequate medical treatment to the inmates in his care. By way of example, there is limited BOP female staff available at the Federal Detention Center. Because of this, the restriction interfered with Dr. Reynolds ability to respond to medical emergencies involving female inmates, as often there was no female BOP staff available to serve as a chaperone.

17. In or about September 2004, Dr Reynolds applied for a position in Central Office (04-CO-119). In his reference, Warden Motley falsely indicated Dr. Reynolds had pleaded guilty to one OIA investigation and had two OIA investigations pending. As a result of this negative reference, Dr. Reynolds was not selected for the position.

18. On or about January 31, 2005, Dr. Reynolds requested that Mr. Arnold remove the practice restrictions. Dr. Reynolds made this request because determinations on similar investigations are usually made within ninety (90) days. Despite knowing that all the allegations were found to be without merit, Associate Warden Arnold would not lift the practice restrictions.

19. BOP's failure to lift the restrictions caused harm to Dr. Reynolds' professional reputation. In particular, Dr. Reynolds also serves as a physician when he called to duty for the Air Force Reserve. Because Dr. Reynolds' re-credentialing for the military was due during this time period, Dr. Reynolds was required to report that the investigation against him was still pending. As a result, Dr. Reynolds' physician privileges with the Air Force Reserve were also restricted.

20. Additionally, charges of inappropriate sexual conduct with a patient are serious charges which can result in automatic sanctions and censure by state medical licensure boards.

Furthermore, such allegations could potentially be reported to the National Practitioner Data Bank.

21. On or about February 7, 2005, Dr. Reynolds, desperate to salvage his professional reputation, sent an electronic message to Warden Motley requesting that the restriction be removed. Warden Motley did not respond to Dr. Reynolds' request.

22. On or about February 14, 2005, Dr. Reynolds called the EEO office to file a complaint regarding the Agency's discriminatory behavior.

23. On or about March 8, 2005, Associate Warden Tracey V. Brown officially removed the practice restrictions against Dr. Reynolds. However, BOP should have notified Dr. Reynolds in a timely fashion that the accusations were unfounded and that the restrictions would be removed, rather than lifting the restrictions only in response to an EEO complaint.

24. On or about March 16, 2005, Dr. Reynolds filed a formal EEO discrimination complaint.

25. In or about May 2005, the formal investigation of Dr. Reynolds' EEO allegations commenced. On or about August 1, 2005, the investigator submitted the EEO Report of Investigation to the EEO office.

## REPRISAL[1]

26. On or about December 11, 2005, Dr. Reynolds submitted his written preferences for annual leave in calendar year 2006 to the Health Services Administrator, Aramis Martinez. Dr. Reynolds indicated his first preference was the seven day period June 25 to July 1, 2006 and his second preference was the seven day period July 2 to July 9, 2006.

27. On June 26, 2006, Dr. Reynolds used accrued sick leave for a doctor's appointment. On June 27, 2006, Dr. Reynolds sent an electronic message to Dr. Odeida Dalmasi, Clinical Director of the Federal Detention Center and Associate Warden Tracey Brown requesting a decision regarding the annual leave requested for June 30 and July 3-5, in addition to military leave for July 6-7. On or about June 29, 2006, Dr. Reynolds sent another e-mail reminding Dr. Dalmasi of his leave request. Dr. Reynolds received no response from Dr. Dalmasi. However, Associate Warden Brown replied electronically that the leave requests were approved in December 2005.

28. Accordingly, in June and July 2006, Dr. Reynolds took the leave he requested for vacation and to attend training with the Air Force Reserve. During his scheduled military leave, Dr. Reynolds' was directed by his Air Force Reserve unit to attend the Aerospace Medicine Primary Course at Brooks Air Force Base, TX, beginning July 11, 2006, where he would remain until August 20, 2006. When he received a copy of the orders for the Aerospace Medicine Primary Course on or about July 24, 2006, he sent documentation to his supervisor and timekeeper indicating his need for additional military leave.

---

[1] Dr. Reynolds retaliation claims are based on EEO Complaint No. P-2006-0320 and EEO Complaint No. BOP - 2007-0419.

29. Despite knowing that Dr. Reynolds could justify the sick leave used on June 26, 2006, and had previously requested leave for vacation and military duty, Dr. Dalmasi nonetheless classified Dr. Reynolds as absent without leave (hereafter "AWOL") for June 26 and June 30, 2006 in retaliation for his EEO complaint.

30. Subsequently, Associate Warden Tracey Brown also classified Dr. Reynolds as AWOL for the period from July 9 through July 22, 2006. Associate Warden Brown went further to announce during a Department Head meeting held in July or August 2006 that Dr. Reynolds was AWOL. These actions were taken in retaliation for Dr. Reynolds' prior EEO complaint.

31. On or about August 28, 2006, Dr. Dalmasi again classified Dr. Reynolds as AWOL despite a communication log entry dated August 27, 2006 which indicated that Dr. Reynolds would be absent.

32. On or about September 7, 2006, Dr. Dalmasi further harassed Dr. Reynolds by questioning his work ethic in front of their supervisor, Associate Warden Brown.

33. On or about September 7, 2006, Dr. Dalmasi met with Dr. Reynolds to supposedly discuss and clarify management's expectations of Dr. Reynolds in regards to the administration of his patient case load and to ensure compliance with BOP policy.

34. On or about September 7, 2006, Dr. Dalmasi alleged that Dr. Reynolds had engaged in misconduct or improper performance of official duties. These allegations were unmerited and were made against Dr. Reynolds in retaliation for filing his race discrimination complaint.

35. On or about September 6, 2006, Dr. Reynolds filed a retaliation complaint with the EEO.

36. On or about November 1, 2006, in an effort to hamper Dr. Reynolds work productivity, BOP restricted Dr. Reynolds access to the Internet. For example, on or about November 15, 2006, Dr. Reynolds could not access an Internet website which contained information which would have assisted him with the treatment of patients with Parkinson's disease.

37. On or about November 29, 2006, in an effort to discredit Dr. Reynolds, BOP informed Dr. Reynolds that it would conducting a focused medical review of several inmates in his care. This review was unfounded and undertaken in retaliation for Dr. Reynolds' EEO complaints.

38. On or about December 27, 2006, Dr. Reynolds attended a conference with Warden Troy Levi and Associate Warden Brown. During the conference, Warden Levi told Dr. Reynolds that he had been in communication with both Northeast Regional Director Dodrill and Medical Director Kendig regarding the focus review. Warden Levi went on to inform Dr. Reynolds that, although the focused review did not indicate incompetence, it supposedly demonstrated that Dr. Reynolds did not complete tasks or follow up on concerns in a timely fashion. Based on this, Warden Levi informed Dr. Reynolds that he would halt Dr. Reynolds' Physician Comparability Allowance Payments and require any payments made during the contract period be repaid to the BOP. Warden Levi then directed Associate Warden Brown to inform him anytime Dr. Reynolds displayed alleged "passive-aggressive" behavior similar to that which purportedly occurred during a visit by the Northeast Region Clinical Consultant, Dr. John Manenti, so that the information could be used to bolster unfounded disciplinary action against Dr. Reynolds in the future.

39. On or about December 29, 2006, in an effort to further retaliate against Dr. Reynolds and to force Dr. Reynolds to resign, Warden Levi and Associate Warden Brown met with Dr.

Reynolds and informed him that there would be ongoing investigations regarding his performance. The Warden also informed Dr. Reynolds that he would have to operate under a daily plan developed by Dr. Dalmasi, Clinical Director at the Federal Detention Center. This daily plan was designed to be demeaning and was a deliberate attempt to harm Dr. Reynolds' professional reputation. The Warden then asked Dr. Reynolds if he wanted to resign.

40. On or about April 3, 2007, Dr. Dalmasi and Associate Warden Brown informed Dr. Reynolds that his medical privileges would be placed in abeyance while an investigation into the care of one of his patients was conducted. Dr. Dalmasi and Associate Warden Brown took this action against Dr. Reynolds in retaliation for filing his EEO complaints.

**STATEMENT OF CLAIMS**
**COUNT I: Race Discrimination in Violation of Title VII:**

41. Plaintiff re-alleges paragraphs 1-40 and incorporates them fully herein.

42. Dr. Reynolds alleges that Defendant, and/or agents or employees acting on its behalf, discriminated against him on the basis of his race (African-American) by denying him employment opportunities and subjecting him to adverse and disparate treatment.

43. As a result of the discrimination, Dr. Reynolds has been subjected to adverse and disparate treatment. Dr. Reynolds further alleges that these acts violate Title VII and that he has suffered and will continue to suffer severe emotional and mental distress, loss of salary and benefits and loss of employment opportunities and career advancement.

**COUNT II: Retaliation in Violation of Title VII:**

44. Plaintiff re-alleges paragraphs 1-43 and incorporates them fully herein.

45. Dr. Reynolds additionally alleges that Defendant, and/or agents or employees acting on its behalf, retaliated against him for his opposition to Defendant's unlawful employment practices, his participation in protected activity and the EEO/EEOC process.

46. As a result of the retaliation, Dr. Reynolds has been subjected to adverse and disparate treatment. Dr. Reynolds further alleges that these acts violate Title VII and that he has suffered and will continue to suffer severe emotional and mental distress, loss of salary and benefits and loss of employment opportunities and career advancement.

**RELIEF SOUGHT**

WHEREFORE, Plaintiff respectfully requests this Court to:

A. Enter judgment for Plaintiff against Defendant on all Counts;

B. Declare that the conduct of Defendant is in violation of Title VII of the Civil Rights Act of 1964, as amended;

C. Order the Agency to cease its disparate treatment and retaliation of Plaintiff and to take such affirmative action as is necessary to ensure that the effects of its unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities, including, but not limiting to, awarding Plaintiff damages to compensate him for his loss of salary and other economic losses, such as employment benefits and other workplace entitlements retroactive to the date of any unlawful action found to have occurred in this case;

D.  Award Plaintiff compensatory damages for the injuries and losses that he suffered in an amount to be proved at trial;

E.  Pecuniary and out of pocket expenses;

F.  Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses incurred by Plaintiff as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest;

G.  Order the Agency to refrain from taking any act of retaliation, including involuntary reassignment or involuntary relocation of Plaintiff because of this suit; and

H.  Order such other equitable and legal relief as the Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff requests a trial by a jury of his peers as to all claims set forth in this Complaint.


Dated: January 15, 2008                    Respectfully submitted,


_____
Camilla C. McKinney
D.C. Bar No. 448776
McKinney & Associates, PLLC
1100 Fifteenth Street, N.W., Suite 300
Washington, D.C. 20005
(202) 861-2934 (telephone)
(202) 517-9111 (facsimile)
***Attorneys for Plaintiff Dr. Gary Irving Reynolds***